## UNITED STATES DISTRICT COURT
## DISTRICT OF DELAWARE

| | | |
|---|---|---|
| JEWELTEX PENSION PLAN, derivatively on behalf of CORCEPT THERAPEUTICS INC., | ) ) ) | Civil Action No. |
| | ) ) | |
| Plaintiff, | ) | |
| vs. | ) ) | **VERIFIED STOCKHOLDER DERIVATIVE COMPLAINT** |
| JAMES N. WILSON, JOSEPH K. BELANOFF, G. LEONARD BAKER, JR., DANIEL M. BRADBURY, RENÉE D. GALÁ, DAVID L. MAHONEY, DANIEL N. SWISHER, JR., KIMBERLY A. PARK, and G. CHARLES ROBB, | ) ) ) ) ) ) ) | JURY TRIAL DEMANDED |
| | ) ) | |
| Defendants, | ) ) | |
| – and – | ) ) ) | |
| CORCEPT THERAPEUTICS INC., a Delaware Corporation, | ) ) ) ) | |
| Nominal Defendant. | ) ) ) | |

Plaintiff Jeweltex Pension Plan ("Plaintiff"), through its undersigned counsel, brings this action derivatively on behalf of, and for the benefit of, Nominal Defendant Corcept Therapeutics Inc. ("Corcept" or the "Company") and alleges upon personal knowledge as to itself and its own acts, and as to all other matters upon information and belief, based upon its counsel's substantial investigation, as follows:

## SUMMARY OF THE ACTION

1.      This is a stockholder derivative action against Corcept's Board of Directors and one officer for reckless and/or grossly negligent breaches of fiduciary duty, mismanagement, corporate waste and other unlawful acts, including the dissemination of a false and misleading proxy solicitation filed with the SEC on April 24, 2018 (the "2018 Proxy") relating to the annual shareholder meeting that took place on May 29, 2018, for the approval of the directors seeking re-election and for the approval of certain changes to the Company's compensation programs, which

has harmed the Company by, among other things, stripping it of its most valuable assets, using the Company as a front for the commission of securities fraud, and resulting in the filing of a securities class action lawsuit against the Company styled *Ferraro Family Found., Inc., et ano v. Corcept Therapeutics Incorporated, et al.*, No. 19-cv-01372-LHK (N.D. Cal.) (First Amended Complaint filed March 14, 2019) ("Ferraro").  Plaintiff brings this action derivatively to redress injuries suffered and to be suffered by Corcept as a direct result of the violations of fiduciary duties by the Individual Defendants.

2.      Plaintiff will adequately and fairly represent the interests of Corcept and its shareholders in enforcing and prosecuting this action.

## JURISDICTION AND VENUE

3.      This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 because Plaintiff's claims raise a federal question under Sections 14(a) of the Exchange Act and SEC Rule 14a-9 (17 C.F.R. § 240.14a-9) promulgated thereunder.  This Court has supplemental jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. § 1367(a).  And this Court has diversity jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1332 because the amount in controversy exceeds $75,000, exclusive of interest and costs, and the dispute is between citizens of different States.

4.      The Court has jurisdiction over each Defendant.  Corcept is incorporated in this District, which renders the Court's exercise of jurisdiction permissible under the traditional notions of fair play and substantial justice.  The Individual Defendants, as corporate officers or directors of Corcept, have sufficient minimum contacts with this District to render the exercise of jurisdiction by this Court permissible under traditional notions of fair play and substantial justice.

5.      This action was not brought collusively to confer jurisdiction on a court of the United States that it would not otherwise have.

6.      Venue is proper in this District pursuant to 28 U.S.C. § 1391 because, among other things, the Individual Defendants engaged in numerous unlawful activities in this District and those unlawful activities had an effect in this District.

## THE PARTIES

7.      Plaintiff, a New York pension plan, purchased shares of Corcept stock in August and October, 2017, and has held this stock continuously since that time.

8.      Nominal Defendant Corcept is a corporation duly organized and existing under the laws of the State of Delaware and maintains its principal executive offices in Menlo Park, California.  The Company is engaged in the discovery, development, and commercialization of drugs for the treatment of severe metabolic, psychiatric and oncologic disorders.  Corcept is publicly traded on the NASDAQ under the ticker symbol "CORT."  Korlym is the Company's first FDA-approved medication.  Korlym blocks the glucocorticoid receptor type II ("GR-II") to which cortisol normally binds, thereby inhibiting the effects of excess cortisol in Cushing's syndrome patients.   The Company's market exclusivity for the drug expired in February 2019.

9.      Defendant James N. Wilson ("Wilson") is Corcept's Chairman of the Board and a director since 1999.  He is a citizen and resident of California. According to Corcept's 2018 Proxy, Wilson is not independent.   During the time period relevant herein, Corcept paid Wilson the following compensation:

| Fiscal Year | Fees Earned or Paid in Cash | Option Awards | Total |
|---|---|---|---|
| 2018 | $120,000 | $638,669 | $758,669 |
| 2017 | $120,000 | $698,575 | $818,575 |

10.      Defendant Joseph K. Belanoff, M.D. ("Belanoff"), a Corcept co-founder, serves as a director and Chief Executive Officer ("CEO") of Corcept since 1999, and as President since 2014.  He is a citizen and resident of California.  According to Corcept's 2018 Proxy, Belanoff is

not independent.  During the time period relevant herein, Corcept paid Belanoff the following compensation:

| Fiscal Year | Salary | Bonus | Option Awards | Total |
|---|---|---|---|---|
| 2018 | $679,792 | $477,750 | $5,157,075 | $6,314,617 |
| 2017 | $647,333 | $702,000 | $2,922,119 | $4,271,452 |

11.     Defendant G. Leonard Baker, Jr. ("Baker"), a Corcept director since 1999, is a citizen and resident of California and the Chairman of the Company's Compensation and Corporate Governance and Nominating Committees.  During the time period relevant herein, Corcept paid Baker the following compensation:

| Fiscal Year | Fees Earned or Paid in Cash | Option Awards | Total |
|---|---|---|---|
| 2018 | $55,000 | $212,889 | $267,889 |
| 2017 | $54,833 | $232,858 | $287,691 |

12.     Defendant Daniel M. Bradbury ("Bradbury") is a Corcept director since October 2012.  Bradbury is a citizen and resident of California and a member of the Company's Compensation and Corporate Governance and Nominating Committees.  During the time period relevant herein, Corcept paid Bradbury the following compensation:

| Fiscal Year | Fees Earned or Paid in Cash | Option Awards | Total |
|---|---|---|---|
| 2018 | $52,375 | $212,889 | $265,264 |
| 2017 | $51,917 | $232,858 | $284,775 |

13.     Defendant Renée D. Galá ("Galá") is a Corcept director since June 2016.  She is a citizen and resident of California, and a member of the Company's Audit and Corporate Governance and Nominating Committees.  During the time period relevant herein, Corcept paid Galá the following compensation:

| Fiscal Year | Fees Earned or Paid in Cash | Option Awards | Total |
|---|---|---|---|
| 2018 | $55,000 | $212,889 | $267,889 |
| 2017 | $53,000 | $232,858 | $285,866 |

14.     Defendant David L. Mahoney ("Mahoney") is a Corcept director since July 2004. He is a citizen and resident of California and a member of the Company's Audit Committee. During the time period relevant herein, Corcept paid Mahoney the following compensation:

| Fiscal Year | Fees Earned or Paid in Cash | Option Awards | Total |
|---|---|---|---|
| 2018 | $60,000 | $212,889 | $272,889 |
| 2017 | $59,833 | $232,858 | $292,691 |

15.     Defendant Daniel N. Swisher, Jr. ("Swisher") is a Corcept director since June 2015. He is a citizen and resident of California and Chairman of the Company's Audit Committee and a member of its Compensation Committee.  During the time period relevant herein, Corcept paid Swisher the following compensation:

| Fiscal Year | Fees Earned or Paid in Cash | Option Awards | Total |
|---|---|---|---|
| 2018 | $67,375 | $212,889 | $280,264 |
| 2017 | $66,542 | $232,858 | $299,400 |

16.     Defendant Kimberly A. Park is a Corcept director since September 2019.  She is a citizen of Pennsylvania.

17.     Defendant G. Charles Robb ("Robb") is Corcept's Chief Financial Officer ("CFO") since September 2011.  He is a citizen and resident of California.

18.     The Defendants referenced in ¶¶ 9 - 17 are referred to herein as the "Individual Defendants."

## DESCRIPTION OF NON-PARTIES

19.     The Southern Investigative Reporting Foundation ("SIRF") is a non-profit organization dedicated to investigative reporting and corporate accountability.  On January 25,

2019, SIRF issued a report demonstrating that Corcept unlawfully paid doctors to prescribe Korlym for off-label use.

20.     Blue Orca Capital LLC ("Blue Orca") is an activist investment firm.  Blue Orca invests in early-stage and startup companies and provides investment services.  On February 5, 2019, Blue Orca reported that 99% of Korlym's sales are through a previously undisclosed related party, the private, specialty pharmacy company named Optime Care ("Optime").  Given the lack of any independent reporting of the financial condition of Optime, Blue Orca posited that there is a material risk that the Company is using Optime to artificially boost sales, hide losses or engage in other financial improprieties.  Furthermore, Blue Orca questioned the veracity and reliability of Corcept's own financial statements to the extent that sales to Optime may have been improperly mis-characterized as off-balance sheet liabilities or receivables.  Additionally, Blue Orca questioned whether revelation of the relationship between Corcept and Optime would lead to increased regulatory scrutiny for the Company.

## SUBSTANTIVE ALLEGATIONS

21.     The FDA approved Korlym on February 17, 2012, for the treatment of patients with inoperable, endogenous Cushing's syndrome who have both hypercortisolism and diabetes. According to an FDA report[1] prepared in connection with the approval of Korlym:

> Cushing's syndrome is a rare disorder with incidence ranging from 0.7 to 2.4 per 1 million persons per year.[2] Ninety percent of all cases of Cushing's syndrome occur during adulthood; the incidence of Cushing's syndrome in children is estimated at approximately 0.2 cases per 1 million persons per year.  It is estimated that at any given time there are approximately 20,000 patients with Cushing's syndrome in the U.S. The peak incidence of Cushing's syndrome due to an adrenal or pituitary tumor occurs in persons 25-40 years of age; females are 8 times more likely than males to develop hypercortisolemia from a pituitary tumor and 3 times more likely to develop a cortisol-secreting adrenal tumor.  In the US, it is estimated that

---

[1]  *Risk Assessment and Risk Mitigation Review(s)*: Korlym, FDA, January 27, 2012.

[2]  This incidence is roughly the same as being struck by lightning, which is 1.5 per million.

approximately 5,000 patients would be considered candidates for treatment with Korlym.

22.     Accordingly, the FDA's approval of Korlym was limited to an estimated population of approximately 5,000 patients in the U.S., or one quarter of the total number of patients with Cushing's syndrome, with the female incidence thereof averaging 5 times more than the male incidence, depending on the presentment of the disease.

23.     In order to boost Korlym sales beyond the very small market of persons approved by the FDA for treatment, which by definition limited Company profitability to the penetration rate of this market, the Individual Defendants, in breach of their fiduciary duties, authorized and oversaw a Company program that funded and promoted the unlawful payment of funds to doctors to prescribe Korlym for non-approved applications, known as off-label use.

24.     Moreover, the Individual Defendants concealed this strategy by disguising the doctor bribes as speaking fees under a speakers bureau program, which is a program ostensibly set up by many pharmaceutical companies as a legal method to educate peers on the use of the drugs manufactured by these companies, in Corcept's case, Korlym.

25.     In addition, in further breach of their fiduciary duties, the Individual Defendants, authorized and oversaw a switch in the specialty pharmacy company that is supposed to process Korlym orders for the private insurance marketplace.  This switchover, although ostensibly done with an independent entity, having a completely separate ownership and financial structure which qualified to make the processor independent from Corcept, was actually anything but independent.

26.     As more fully set forth herein, several anomalies are manifest in the Company's speakers bureau program and specialty pharmacy company switchover that establish that the Individual Defendants breached their fiduciary duties in connection therewith.  In fact, the discovery of the anomalies are how their breaches of fiduciary duty came to light.

27.     *First*, many Korlym prescriptions came to be filled in small towns far from the experts and hospitals specializing in the endocrinological needs of patients suffering from inoperable, endogenous Cushing's syndrome with both hypercortisolism and diabetes, the only ailment FDA approved for on-label use of Korlym.

28.     *Second*, the amount of honorarium payments pursuant to Corcept's speakers bureau program was at least $7,500 per doctor to eleven out of the 15 doctors who were the most frequent prescribers of Korlym in 2016 and 2017 combined.

29.     *Third*, a U.S. Department of Veterans Affairs ("VA") clinic with a male population exceeding 91% generated a disproportionately large amount of Korlym prescriptions, equating to 9.1% of Corcept's 2017 revenue, contravening the FDA's statistics demonstrating that Korlym's patient population comprises women more than men by an almost 5-to-1 ratio.

30.     *Fourth*, one doctor alone in the foregoing VA clinic received over 12% – or $95,139 – of the Company's payments to doctors under its speakers bureau program in 2017, more than seven times the $13,524 he received in such payments in 2016.

31.     *Fifth*, this same VA clinic generated almost 10% – $14.51 million – of Corcept's 2017 sales.

32.     *Sixth*, a single doctor in Summerville, South Carolina, received the exorbitant amount of $73,777 in speakers bureau payments in 2017.

33.     *Seventh*, Corcept paid more than $337,000 in speakers bureau payments in 2016/2017 to just ten doctors responsible for billing more than $5 million of Korlym to Medicare Part D.

34.     *Eighth*, when Corcept switched its single specialty pharmacy processing of Korlym orders for the private insurance marketplace to Optime in August 2017: (i) Corcept (and its drug

Korlym) was Optime's first and only client; (ii) Corcept actually designed Optime's claims and inventory reporting systems; (iii) Corcept's revenue growth rate immediately accelerated, and (iv) Optime has grown to become the source of 99% of Corcept's revenues.

35.    ***Ninth***, based upon the foregoing, there is more than a reasonable basis to suspect that Optime is actually an "undisclosed related party," and is being manipulated to boost sales, hide losses, or engage in other "financial shenanigans," actually requiring Corcept, under the relevant accounting and auditing rules and regulations, to restate its financials to consolidate its own operational and financial results together with those of Optime.

36.    Last but not least, the foundation that Optime and Corcept are related parties is materially and significantly buttressed by a recorded telephone call placed to Optime, but answered by a representative that identified herself as a Corcept representative, as did a subsequent representative to whom the caller was transferred for assistance.

37.    Consequently, as more fully set forth herein, the Individual Defendants have breached their fiduciary duties of candor, good faith, loyalty, and due care, in connection with their stewardship of Corcept.

### A.    Insider Trading

38.    During the period of time when the Company materially misstated information to the investing public to keep the stock price inflated, and before the scheme was exposed, Defendants Baker, Belanoff, Mahoney, and Robb (the "Insider Trading Defendants") made the following sales of Corcept stock.  The 2018 Proxy states that the Company's insider trading policy "prohibits our named executive officers and Board members from engaging in short-term or speculative transactions in our stock, including short sales."

39.    During the relevant period, while in possession of material adverse non-public information, Defendant Baker sold the following Corcept stock:

| Date | Number of Shares | Price | Proceeds |
|------|------------------|-------|----------|
| November 13, 2017 | 30,000 | $17.59 | $527,556 |
| May 11, 2018 | 30,000 | $16.01 | $480,312 |

40.    During the relevant period, while in possession of material adverse non-public information, Defendant Belanoff sold Corcept stock:

| Date | Number of Shares | Price | Proceeds |
|------|------------------|-------|----------|
| December 12, 2018 | 217,115 | $19.01 | $2,381,310 |

41.    During the relevant period, while in possession of material adverse non-public information, Defendant Mahoney sold the following Corcept stock:

| Date | Number of Shares | Price | Proceeds |
|------|------------------|-------|----------|
| July 12, 2017 | 6,510 | $12.50 | $81,375 |
| July 13, 2017 | 484 | $12.55 | $6,074 |
| July 18, 2017 | 6,091 | $12.50 | $76,138 |
| July 19, 2017 | 16,915 | $12.50 | $211,438 |

42.    During the relevant period, while in possession of material adverse non-public information, Defendant Robb sold the following Corcept stock:

| Date | Number of Shares | Price | Proceeds |
|------|------------------|-------|----------|
| December 12, 2018 | 25,000 | $19.01 | $475,152 |

**B. The SIRF Report**

43.    On January 25, 2019, SIRF reported that Corcept – contrary to the Company's reporting of its own business practices to investors and the public, which were contradicted by SIRF's forensic analysis of published health statistics and financial data – actually and unlawfully paid doctors to prescribe Korlym for off-label uses through Corcept's use of a physician speakers bureau, which is ostensibly tasked to build drug awareness, but has been known to be abused by advocating for off-label uses.

44.     In sum and substance, the data underlying SIRF's report demonstrates that a statistically significant portion of Corcept's success selling Korlym and profiting therefrom was from the unlawful activity of bribing doctors to prescribe Korlym for diabetes through its abuse of the physician speakers bureau, instead of limiting sales of Korlym to the only FDA approved application for people suffering from endogenous Cushing's syndrome who have both hypercortisolism and diabetes.   SIRF based its report of bribing doctors for issuing off-label prescriptions on several factors, including:

- The peculiar geographic clustering of high-volume Korlym prescribers in small towns and modest-sized cities (such as Wilmington, North Carolina, Zanesville, Ohio, and Murfreesboro, Tennessee), distant from established medical research centers that typically treat the population of patients suffering from endogenous Cushing's syndrome with hypercortisolism and diabetes;

- Corcept's CFO's specious explanation that the clustering of Korlym prescribers in smaller communities was because that is the group of physicians that recognized earlier than their colleagues how the disease that was affecting their patients could be treated;

- Medicare Part D and the Department of Veteran Affairs records (the only two public sources available for Korlym related data) demonstrating that out of the 44 doctors who each wrote at least 11 Korlym prescriptions in 2016, eleven of the 15 doctors who are the most frequent prescribers of Korlym received at least $7,500 in speakers bureau payments from Corcept in 2016 and 2017 combined;

- The Orlando VA Medical Center's 84 prescriptions of Korlym from 2016 to 2018, with 50 prescriptions in 2017 alone; notwithstanding that the nationwide VA patient base is more than 91 percent male, but Cushing's syndrome occurs in women by a factor of 5 times over men;

- Dr. Hanford Yau's (of the Orlando VA Medical Center) 27 prescriptions of Korlym and his receipt of $95,139 from the Company in speakers bureau payments in 2017 — more than 12% of such payments — a more than sevenfold increase from his receipt of such payments in 2016 in the amount of $13,524, for purposes unrelated to drug research;

- The Orlando VA Medical Center's Korlym prescriptions in 2017 generated more than $14.51 million in Corcept's sales, or 9.1 %, of its $159.2 million in revenue;

- The receipt of $73,777 in speakers bureau payments in 2017 by another doctor from Summerville, South Carolina, for purposes unrelated to drug research; and

- Corcept's combined 2016/2017 payments in speakers bureau payments of approximately $337,000 to only ten doctors responsible for the billing of Korlym to Medicare Part D in excess of $5 million.

45.     The SIRF report limited its forensics to the public sources of Korlym related data because "[p]eople who rely on private insurers place their orders through a single specialty pharmacy, whose sales are not reported to prescription-monitoring services."

##  C. The Blue Orca Report

46.     On February 5, 2019, Blue Orca issued a forensic report that picked up from where SIRF left off.  Blue Orca reported that Optime, the single specialty pharmacy processing Korlym orders for the private insurance marketplace (which was not addressed by SIRF) is actually an "undisclosed related party" to Corcept, creating "a material risk that the Company is using its captured pharmacy to boost sales, hide losses, or engage in other financial shenanigans."  Blue Orca based its report regarding Optime on several factors, including:

- Optime's "first and we [*i.e.*, Blue Orca] think only major client is Corcept" and its drug Korlym;

- Corcept's revenue growth rate accelerated significantly immediately following the switch to Optime, "which formally took place in August 2017;"

- Corcept increased its guidance substantially right before it switched to Optime;

- 99% of Corcept's revenues are derived from sales of Korlym through Optime;

- Claims made in dueling lawsuits filed between Corcept and its prior sole specialty pharmacy (before the switchover to Optime) supporting the theory that the switchover to Optime was: (i) "driven by Corcept's desire to increase its influence and control over its specialty pharmacy"; (ii) the opening event that made Corcept the first customer of Optime; and (iii) Corcept actually designed Optime's claims and inventory reporting systems;

- The startup status of Optime at the time of Corcept's switchover, having only thirty two employees; and

- When Blue Orca placed a recorded investigatory call to Optime, the call was answered by a representative that identified as a Corcept representative, as did a subsequent representative to whom the caller was transferred for assistance.

47.     As a result of the foregoing, Blue Orca asserted that "Corcept must restate its financials to consolidate its" results together with those of Optime pursuant to the public accounting rules and requirements for related party transaction and, consequently, publication of Corcept's control over Optime will likely negatively impact future prescription volumes and sales of Korlym.

### D.   The Securities Class Action Complaint

48.     On December 6, 2019, the First Amended Complaint was filed in the *Ferraro* securities class action lawsuit in the Northern District of California against the Company and Defendants Belanoff and Robb on behalf of purchasers of Corcept securities between August 2, 2017 and January 31, 2019, inclusive (the "Class Period").

49.     In the *Ferraro* complaint, the plaintiff alleges that throughout the Class Period, Corcept, Belanoff and Robb materially misrepresented (and omitted to state information necessary to make the statements made not misleading concerning) that the Company: (i) did not pay doctors to prescribe off-label Korlym; (ii) specialty pharmacy Optime was not a related party; (iii) reported revenue and sales were not inflated by illicit sales practices with a related party; and as a result of the foregoing, (iv) that Defendants positive statements about the Company's business, operations, and prospects were materially misleading and/or lacked a reasonable basis.

### E.   The 2018 Proxy

50.     Corcept's 2018 Proxy contained false and misleading statements and omissions in

violation of §14(a) of the Exchange Act.   The 2018 Proxy contained the following statements in

urging shareholders to vote in favor of re-election of Defendants:

> [O]ur director nominees have a reputation for integrity, honesty and adherence to
> high ethical standards and have demonstrated business acumen, sound judgment
> and a commitment to serve our company and the Board. Our Board believes that
> the backgrounds and qualifications of these nominees, considered as a group,
> exhibit a combination of experience, knowledge and talent that will allow them to
> fulfill their responsibilities as Board members.

51.     In regard to risk oversight, the 2018 Proxy stated, in part:

> The Board oversees our risk exposures and risk management and the steps
> management has undertaken to control business and financial risks. The Board
> reviews our strategic plan at least annually and assesses the risks facing our
> company. While the Board has ultimate responsibility for the Company's risk
> management process, various committees of the Board also have responsibility for
> risk management. Our Audit Committee oversees management of risks relating to
> accounting matters, financial reporting and SEC compliance. Our Compensation
> Committee oversees the management of risks relating to executive compensation.
> In addition, in setting compensation, the Compensation Committee strives to create
> incentives that discourage risk-taking that is inconsistent with our business strategy.
> Our Corporate Governance and Nominating Committee oversees management of
> risks associated with maintaining independence of our Board and preventing
> conflicts of interest. Each committee regularly reports to the full Board.

52.     The 2018 Proxy also states that the Compensation Committee and the Board

determined the following with respect to Corcept's compensation policies, plans, and practices,

which are "appropriately balanced and do not create risks that will have a material adverse effect

on our company."

> To make this determination, they reviewed the company's compensation policies,
> plans and practices with a focus on compensation program design, payment
> methodology, relationship to performance and length of performance period, and
> oversight and controls as compared to the compensation practices that they have
> seen in similar companies. During the review, the Compensation Committee noted
> risk mitigating factors inherent in our compensation practices, including the
> Compensation Committee's and management's discretion in approving executive
> and employee compensation and establishing performance goals for short and long-

term compensation plans, the balance between fixed and variable pay and the mix of short and long-term incentives that encourage consistent performance over a sustained period, and these factors aligned the interests of our named executive officers and employees with those of our stockholders.

53.     The 2018 Proxy also boasted of "[i]ncreased revenue from the sale of Korlym for the treatment of patients with hypercortisolism from $81.3 million in 2016 to $159.2 million in 2017, an increase of 96 percent."

54.     The 2018 Proxy also gave an overview of the Company's 2017 Executive Compensation Program.  According to the 2018 Proxy, Defendants Belanoff and Robb received a 5.5% increase in their salaries. Based on approval by the Compensation Committee.  They were also awarded bonuses by the Company for their "achievement of corporate goals."

55.     Defendants' statements misleadingly suggested that: (i) the Board maintained adequate compliance, internal control, disclosure review, and reporting programs to mitigate wrongdoing and apprise the Board of significant risks; (ii) the Audit Committee adequately reviewed the Company's financial statements and disclosures and monitored disclosure and internal controls to ensure they were effective; and (iii) the 2018 Proxy made sufficient disclosures regarding the sale of Korlym and related party transactions.

56.     These false and misleading statements and omissions were an essential link in the re-election of the Director Defendants to the Board.  As a result of the Directors' misleading statements in the 2018 Proxy, Corcept's stockholders voted to reelect the Defendant Directors to the Company's Board.

### THE INDIVIDUAL DEFENDANTS' DUTIES

57.     By reason of their positions as officers, directors, and/or fiduciaries of Corcept, and because of their ability to control the business and corporate affairs of Corcept, the Individual Defendants owed, and owe, the Company and its shareholders fiduciary obligations of trust,

loyalty, good faith, and due care, and were, and are, required to use their utmost ability to control and manage Corcept in a fair, just, honest, and equitable manner. The Individual Defendants were, and are, required to act in furtherance of the best interests of Corcept and its shareholders so as to benefit all shareholders equally, and not in furtherance of their personal interest or benefit.

58.     Each director and officer of the Company owed, and owes, to Corcept and its shareholders the fiduciary duty to exercise good faith and diligence in the administration of the affairs of the Company and in the use and preservation of its property and assets, and the highest obligations of fair dealing.

59.     To discharge their duties, the officers and directors of Corcept were required to exercise reasonable and prudent supervision over the management, policies, practices, and controls of the financial affairs of the Company. By virtue of such duties, the officers and directors of Corcept were required to comply with the Company's Code of Ethics ("The Code") which requires the Individual Defendants to:

(a) engage in honest and ethical conduct, including the ethical handling of actual or apparent conflicts of interest between personal and professional relationships;

(b) fully and fairly disclose in an accurate, timely, and understandable manner all disclosures in the Company's periodic reports and other public communications;

(c) comply with applicable government laws, rules, and regulations; and

(d) promptly report any violation of the code to the Audit Committee.

60.     The Individual Defendants are held accountable for adherence to the Code and could face disciplinary action, up to and including termination from the Company.

61.     While the Board has the "sole and absolute discretionary authority" (with recommendations made by the Audit Committee) to provide waivers for the Code, no such waivers were disclosed on any form 8-K filed with the SEC.

62.     Indeed, management without accountability can lead to self-interested decision-making that may not benefit the company or its shareholders.  As a result, shareholders elect a board of directors to represent their interests, and, in turn, the board of directors, through effective corporate governance, makes sure that management effectively serves the corporation and its shareholders.

### A.  Additional Duties of the Audit Committee

63.     In addition to the fiduciary duties described above, the members of the Board's Audit Committee (Chairman Swisher, Galá, and Mahoney) are responsible for discussing with management any matter that any of them or the Committee "believes could significantly affect the financial statements and should be discussed privately."  The Audit Committee must also establish a procedure for receiving, retaining, and treating any complaints about Corcept's accounting, internal accounting controls or auditing matters, and for the "confidential and anonymous submission by employees of concerns regarding accounting or auditing matters."  The Audit Committee must also review and approve all related party transactions.

### B.  Additional Duties of the Compensation Committee

64.     The Compensation Committee's Charter requires its members (Chairman Baker, Bradbury, and Swisher) to evaluate and approve the Company's executive compensation plans, policies, and programs.  Additionally, the members of the Compensation Committee shall review the employment and severance agreements of Corcept's executive officers. The Committee is also tasked with, *inter alia*:

- Producing an annual report on executive compensation for inclusion in the Company's proxy statements;

- Provide minutes of Compensation Committee meetings to the Board, and report any significant matters arising from its work;

- Direct responsibility for the appointment, compensation and oversight of the work by any compensation consultant, legal counsel and other advisor retained by the Compensation Committee.

**C. Additional duties of the Corporate Governance and Nominating Committee**

65.     The Corporate Governance and Nominating Committee consists of Chairman Baker, Bradbury, and Galá.  Each of these defendants is charged with reviewing and assessing the adequacy of Corcept's corporate governance guidelines and recommending proposed changes to the Board.  The Corporate Governance and Nominating Committee is also responsible for legal and regulatory compliance oversight, including the evaluation of Corcept's compliance programs in accordance with Federal healthcare and FDA requirements.  Additionally, members of the Corporate Governance and Nominating Committee are to conduct reviews of the Board and its committees "in accordance with the Company's corporate governance guidelines and the committee charters and report the evaluation to the Board."

## DERIVATIVE AND DEMAND FUTILITY ALLEGATIONS

66.     Plaintiff pleads demand futility as such a demand on Corcept's board would constitute a wasteful, futile and useless act.  As detailed below, this complaint shows the named Defendants, individually and in concert, breached their fiduciary duties of good faith, loyalty, and due care, and were derelict in managing and controlling Corcept fairly, justly, honestly, and equitably.  The personal conflicts of interest faced by a majority of the current directors give rise to a showing these individuals cannot act independently or impartially.

67.     A decision as to whether to bring legal action for the wrongs alleged here cannot be brought by a majority of Corcept's Board as they (a) face a substantial likelihood of liability

for breaches of fiduciary duty that cannot be exculpated due to their participation or acquiescence in the wrongs alleged herein and/or failures to comply with the Company's Code of Business Conduct, and for their lack of supervision as directors of Corcept, and/or (b) cannot be said to be independent from each other or from those faces a substantial likelihood of liability.

68.     The Corcept Board consists of eight (8) directors.  A majority of these individuals are neither disinterested nor independent (as governed by NASDAQ rules) with respect to the acts and omissions alleged herein.  Each faces a substantial likelihood of personal liability for their breaches of the duties of trust, loyalty, good faith, candor, oversight, reasonable inquiry, supervision, and due care described herein.

### A. Demand is Futile as to All Directors Because Each Faces a Substantial Likelihood of Liability

69.     Due to their control of Corcept, the Individual Defendants cannot independently act in a disinterested manner in considering a demand request.

70.     The Individual Defendants have known, disregarded and/or directly benefitted from the wrongs complained of herein.

71.     As detailed herein, the Individual Defendants participated in, approved and/or permitted wrongdoing or disregarded the wrongdoing alleged in this Complaint, and are thus not disinterested.

72.     Corcept has been, and will continue to be exposed to significant losses due to the wrongdoing complained of herein, yet the Individual Defendants have not attempted to recover for Corcept the damages the Company has suffered or will suffer thereby.  Corcept either continues to employ the Individual Defendants  who were responsible for the damages caused and has not publicly reported any disciplinary action taken against them or has allowed them to resign without any publicly reported disciplinary action taken against them.

73.     The Individual Defendants face a substantial likelihood of liability for their individual misconduct.  The Individual Defendants were directors at all times relevant and, as such, had a fiduciary duty to ensure that the Company's business and activities are conducted in compliance with all relevant law and regulations.

74.     Further, the Individual Defendants owed a duty to, in good faith and with due diligence, exercise reasonable inquiry, oversight, and supervision: ensure that the Company's Korlym drug was not prescribed off-label.  The Directors owed a further duty to ensure that insurance claims were honest, that full disclosure was made to shareholders and the public about payments and services offered, and that controls were in place to ensure compliance with the all relevant laws.  However, the Defendant Directors knew or should have known that the speakers bureau program implemented by Corcept and its switchover of the specialty pharmacy processing function to Optime violated the law.

75.     Moreover, the Individual Defendants were required to ensure that the Audit, Compensation, and the Corporate Governance and Nominating Committees' duties were being discharged in good faith and with the required diligence and due care; and to ensure that the Company's officers, including its CEO, were competent and capable of fulfilling their functions. Instead, they reckless disregarded, reviewed, authorized, and/or allowed the speakers bureau program and switchover to Optime to occur without following required governance, procedures and proper protocols.

76.     It was improper for the Individual Defendants to pay out compensation and bonuses to the Individual Defendants.  There is no reasonable business judgment to pay wayward fiduciaries.

77.     The Individual Defendants would have to sue themselves and/or their fellow directors and officers of Corcept, with whom they have common interest, dependence, and alliances, which would make bringing an action for breach of fiduciary duties futile.  As such, this is not something they would do.  Therefore, the Individual Defendants cannot act in a manner which shows independence and disinterest in considering a demand.

### B.   Demand is Futile as to the Audit Committee Defendants

78.     While the Audit Committee is authorized to make waivers to the Company's Code of Conduct for Officers, no such waivers to the provisions above were made; if any waivers were made, they were not made public (as required by law).

79.     Furthermore, members of the Audit Committee (Chairman Swisher, Galá, and Mahoney) are required to comply with its Charter, which, among other things, provides that every transaction with a related person must be disclosed pursuant to Item 404(a) of SEC Regulation S-K and properly pre-approved before being engaged in, and the Charter of the Compensation Committee, which, among other things, provides that the Committee is responsible for working with independent auditors to ensure the integrity of Corcept's financial statements and to ensure all necessary disclosures are made.

### C.   Demand is Futile as to the Compensation Committee Defendants

80.     The Compensation Committee Defendants (Chairman Baker, Bradbury, and Swisher) owed and owe specific duties to Corcept and its shareholders regarding the Company's compensation practices.  Specifically, the Compensation Committee is responsible for, inter ala: Reviewing compensation policies and practices for executive officers

- Reviewing and approving corporate goals and objectives relevant to executive compensation, including the CEO's performance;

- Overseeing the grant of incentive and equity-based compensation, including modifying or cancelling such plans;

- Reviewing and approving (subject to shareholder of Board approval) the creation or amendment of compensation plans (other than amendments to tax-qualified employee benefit plans and trusts, and any supplemental plans thereunder, that do not substantially alter the costs of such plans to the Company or are simply to conform such plans to applicable laws or regulations);

- Reviewing and approving  employment and severance agreements; and

- Review periodically the compensation and benefits offered to nonemployee directors and recommend changes to the Board as appropriate.

81.     Despite these duties, the Compensation Committee Defendants knowingly or recklessly reviewed and approved, or failed to exercise due diligence and reasonable care in reviewing the administration of the Company's compensation program, preventing the off-label promotion of Korlym, and failed in their specific duties to ensure full disclosure and accounting of Corcept's related party specialty pharmacy, Optime.   Accordingly, the Compensation Committee Defendants face a sufficiently substantial likelihood of liability for breach of their fiduciary duties of loyalty and good faith.   Any demand upon the Compensation Committee Defendants therefore is futile.

### D.  Demand is Futile as to the Corporate Governance and Nominating Committee Defendants

82.     The Corporate Governance and Nominating Committee Defendants (Chairman Baker, Bradbury, and Galá) were and are charged with identifying suitable individuals to serve on the Board and to oversee the Company's corporate governance policies.  These duties include, but are not limited to:

- Preparing and recommending corporate governance guidelines and assessing the adequacy of such guidelines, as well as recommending any proposed changes for Board approval;

- Providing oversight of Corcept's legal and regulatory compliance to ensure the effectiveness of the Company's compliance with Federal healthcare program and FDA requirements; and

- Reviewing and assessing Corcept's Code of Ethics and causing all of the Company's directors and officers to provide a written confirmation of compliance with the Code annually.

83.     By accepting appointments to serve on Corcept's Corporate Governance and Nominating Committee, Defendants Baker, Bradbury, and Galá undertook to fulfill the requirements of such service in good faith.  The events that have transpired, as alleged herein, demonstrate that they breached their fiduciary duties of loyalty and good faith in failing, inter alia, to identify, maintain, and manage the adequacy of Corcept's corporate governance procedures.

### E.  Demand is Futile as to Defendants Wilson, Belanoff, and Robb

84.     Defendant Wilson is Corcept's Chairman of the Board and a director since 1999. Defendant Belanoff is co-founder of the Company, its CEO, and a director since 1999. Additionally, Defendants Belanoff and Robb face a substantial likelihood of liability as named defendants in the *Ferraro* securities complaint.

85.     The Company states in its 2018 Proxy that Defendants Wilson and Belanoff are not independent.

86.     Furthermore, Defendant Robb, was interviewed in December 2018 for the SIRF report.

Asked about the recent sharp increase in the number of deaths recorded for Korlym in the FDA's adverse events reporting system (FAERS), to 37 in the first nine months of 2018 from 17 for all of 2017, Robb was adamant that none of the deaths could be directly attributed to Korlym. In response to a question about how he could be certain of that, he said, "All [the FAERS death reports] are adjudicated by a third party": Robb added that Corcept retains Ashfield to provide pharmacovigilance, a service that evaluates reports of a drug's adverse events for a manufacturer. And he insisted that the medicine and its dosage were not responsible for any of 103 deaths reported for Korlym since 2012. He did not answer a question about why 17 of the 103 death reports mentioned "product used for unknown indication."

*        *        *

Robb did, however, have a lengthy list of possible causes for these deaths: "The thing to understand is these patients are very ill. Some of them have adrenal

cancer," he said, "Some of them ahead have been suffering from the symptoms of Cushing's syndrome for decades; some are simply elderly and the list of medications these patients have to take can be 20 and 30 drugs long."

87.    The SIRF report noted Defendant Belanoff's "$180,000" price tag for Korlym, which was based on a year's supply of 300 milligrams of the drug, as nowhere near the suggested 600 milligram daily dose.  According to the SIRF report, a more accurate number would be $308,000 per year.  This cost is likely to rise, as Belanoff noted in a recent conference call:

> Well, I have talked about this before, which is that in the seismic study the study for approval for the average dose is 730 mg per patient, and we believe that over time that may be a long period of time as the market gets to its full maturity will end up in about that zone anyway. And we've seen modest increases over time, but that is not a material part of our growth.

### F.   Demand is Futile as to the Individual Defendants for Additional Reasons

88.    Corcept's Board has already demonstrated that it cannot independently and disinterestedly consider a pre-suit demand to bring the claims set forth herein.  Despite the wrongdoing of Defendants through their false and misleading statements, the Board has taken no serious action to address the harm this misconduct has caused the Company.  Despite informing the public of Corcept's compliance requirements, and touting the strong sales numbers for its prized drug Korlym, the truth revealed otherwise.  The Individual Defendants breached their fiduciary duties by allowing the Company to violate the law, and for allowing Korlym sales to be tainted by the ambassador and kickback programs during all relevant times.

89.    A majority of the Individual Defendants received stock option awards to purchase thousands of shares of common stock merely for being appointed to the Board, as more fully set forth above.  This compensation provides a substantial stipend to these directors, from which each of them personally benefits, depending for his or her livelihood in substantial part on Corcept.  Thus, demand on the of the Individual Defendants  is futile because a majority of them, through their course of conduct to date, have demonstrated their unwillingness to undertake any action that

would threaten the economic benefits they receive or will receive for continuing to serve as directors on Corcept's Board.

90.     Under the factual circumstances described herein, the Individual Defendants are more interested in protecting themselves than they are in protecting Corcept by prosecuting this action.  Therefore, demand on Corcept and its Board is futile and is excused.

91.     Corcept has been and will continue to be exposed to significant losses due to the Defendants' wrongdoing.  Yet, the Individual Defendants have not filed any lawsuits against those responsible for the wrongful conduct.   Thus, the Individual Defendants are breaching their fiduciary duties to the Company and face a sufficiently substantial likelihood of liability for their breaches, rendering any demand upon them futile.

92.     Amongst the red flags ignored by the Individual Defendants was causing Corcept to be in violation of its Annual Declaration of Compliance Notice posted on its website on June 13, 2019:

> As part of our continuing commitment to corporate compliance, Corcept Therapeutics Incorporated (Corcept) declares that, to the best of its knowledge, based on a good faith understanding of the statutory requirements of California Health and Safety Code sections 119400, that Corcept has established a California Comprehensive Compliance Program (CCP) as mandated by California law.
>
> The CCP contains policies, procedures and processes to address risk areas identified in the "Compliance Program Guidance for Pharmaceutical Manufacturers" published by the Office of the Inspector General, U.S. Department of Health and Human Services (OIG Guidance) and the Pharmaceutical Research and Manufacturers of America voluntary code on Interactions with Healthcare Professionals (the "PhRMA Code").
>
> For purposes of complying with the California Health and Safety Code § 119402, Corcept has established a $2,000 annual dollar limit on business meals and educational items that may be provided to an individual healthcare professional. Waiver of the limit would require the approval of the Chief Compliance Officer. As of the date of this declaration, Corcept declares that, to the best of its knowledge and based on a good faith understanding of the requirements of the statute, it is in compliance with its CCP and with California Health and Safety Code § 119402, in all material aspects.

93.     Despite assurances above, the Individual Defendants did cause the Company to pay out speakers fees to doctors in excess of its $2,000 limit (and in violation of California law) for off-label purposes.

94.     Tellingly, the Individual Defendants also caused Corcept to also fall into non-compliance in regard to its related pharmacy Optime.  Providers are required to disclose and account for related party transactions.  Medicare's Provider Reimbursement Manual defines a related party transaction as one in which an entity receives goods or services from another entity that is under common ownership or control.  A related party relationship exists if there is a significant showing of common control or ownership.  As demonstrated by the SIRF report, the Individual Defendants caused Corcept to violate the law even as it purported to be in compliance with all relevant laws and regulations.

### G.  Demand is Futile as the Company is Facing a Securities Class Action Lawsuit

95.     In light of the above class action, Corcept has to defend itself against the false and misleading statements and unlawful practices engaged in and allowed to be engaged in by the Individual Defendants.  The wrongs alleged herein subject the Company to financial and reputable harm.  The Individual Defendants cannot take action against these wrongs when they have to defend themselves from these very actions.  Therefore, Plaintiff pleads demand futility and asks this Court for judicial relief.

96.     In sum, the revelations about Corcept  during the relevant period have confirmed: (a) the pervasiveness of the fraudulent business practices Valeant used to deceive payors; (b) the falsification of Corcept's financial statements in violation of GAAP; (c) the material weaknesses in Corcept's internal controls; (d) the Individual Defendants' misrepresentations concerning Korlym's sales growth; and (e) Corcept's resulting exposure to massive business and regulatory risks which have resulted in securities investigations, a dramatic reduction in Corcept's financial

guidance, and reputational damage to the Company.  In short, the Company's business prospects

and profitability were anything but what they were reported to be during the relevant period.

99.      Thus, for all of the reasons set forth above, all of the Directors, and, if not all of

them, at least seven of the Directors, cannot consider a demand with disinterestedness and

independence. Consequently, a demand upon the Board is excused as futile.

## COUNT I
## (Breach of Fiduciary Duties)

98.      Plaintiff incorporates by reference and realleges each and every allegation set forth

above as if fully set forth herein.

99.      Each Corcept Defendant owed Corcept and its shareholders the highest duties of

loyalty, honesty, candor and care in conducting their affairs.

100.      At a minimum, to discharge these duties, each Corcept Defendant should have

exercised reasonable and prudent supervision over the management, policies, practices, controls,

procedures and financial affairs of Corcept.  By virtue of these obligations, each Corcept Defendant

was required, inter alia:

    (a)      [T]o promote high standards of integrity by conducting our affairs in an honest and ethical manner;

    (b)      [E]nsure that all employees comply with the relevant laws, rules and regulations associated with their employment;

    (c)      Avoid conflicts of interest;

    (d)      To refrain from owning, directly or indirectly, a significant financial interest in any entity that does business, seeks to do business or competes with [Corcept];

    (e)      [To] engage in fair dealings; and

    (f)      Protect Company assets.

101.    The Individual Defendants also each owed a duty to Corcept to ensure bribes were not paid to doctors for prescribing Korlym, to refrain from using Corcept resources to convince patients to take or stay on Korlym, to place decision-making power in disinterested directors, to see to it that a majority of disinterested directors made compensation determinations, and to place honest and complete information before health insurers, the government and the public in regard to Korlym.  Given the above, the Individual Defendants are required to reimburse Corcept for the bonuses and other incentive-based and equity-based compensation received by them from Corcept from and after the start of the kickback and ambassador schemes.

102.    The Individual Defendants should be required to remunerate Corcept for its damages and disgorge any and all gains unjustly obtained at the expense of Corcept and its shareholders by way of their breach of their fiduciary duties.

103.    Accordingly, Plaintiff seeks on behalf of Corcept monetary damages, injunctive remedies, and other forms of equitable relief.

## COUNT II
### (Against the Individual Defendants for Violations of Section 14(a) of the Exchange Act)

104.    Plaintiff incorporates by reference and realleges each and every allegation set forth above as if fully set forth herein.

105.    This claim is based solely on negligence, not on any allegation of reckless or knowing conduct by or on behalf of the Individual Defendants.  Plaintiff specifically disclaims any allegation or reliance upon any allegation or reference to any allegation of fraud, scienter, or recklessness with regard to this claim.

106.    SEC Rule 14a-9 (17 C.F.R. § 240.14a-9), promulgated under Section 14(a) of the Securities Exchange Act of 1934, provides:

No solicitation subject to this regulation shall be made by means of any proxy statement form of proxy, notice of meeting or other communication, written or oral, containing any statement which, at the time and in the light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading or necessary to correct any statement in any earlier communication with respect to the solicitation of a proxy for the same meeting or subject matter which has become false or misleading.

107.    The Individual Defendants negligently issued, caused to be issued, and participated in the issuance of materially misleading written statements to stockholders that were contained in the 2018 Proxy.  The 2018 Proxy contained proposals to Corcept's shareholders urging them to re-elect certain members of the Board, and to approve the compensation of the Company's executive officers.  The 2018 Proxy, however, misrepresented or failed or failed to disclose material deficiencies in Corcept's risks management and internal controls that were known to the Individual Defendants when filed and that the Company faced significant financial and reputational harm when the truth would inevitably unfold.  Corcept's 2018 Proxy misrepresented, among other things, that the Board had oversight of and the Company maintained adequate internal controls.  Instead, the Company's touting of its Korlym sales despite the lack of full disclosure about those sales, materially misrepresented to shareholders that the Company's prescriptions, profitability and did not suffer from off-label prescriptions, kickbacks, and related party transactions.

108.    By reason of the conduct alleged in this Complaint, the Individual Defendants violated Section 14(a) of the Exchange Act and SEC Rule 14a-9.  As a direct and proximate result of the Individual Defendants' wrongful conduct, Corcept mislead or deceived its stockholders by making misleading statements that were an essential link in shareholders heeding Corcept's recommendation to re-elect the current Board and approve certain compensation proposals.

109.    The misleading information contained in the 2018 Proxy was material to Corcept's shareholders in determining whether or not to elect the Individual Defendants and approve certain compensation matters.  This information was also material to the integrity of the directors who were proposed for election to the Board.  The proxy solicitation process in connection with the Proxy Statements was an essential link in the reelection of nominees to the Board and the approval of certain changes to the compensation plan.

110.    Plaintiff, on behalf of Corcept, seeks relief for damages inflicted upon the Company based on the misleading 2018 Proxy in connection with the improper re-election of the members of the Board and approval of compensation matters.

111.    This action was timely commenced within three years of the date of the 2018 Proxy and within one year from the time Plaintiff discovered or reasonably could have discovered the facts on which this claim is based.

## COUNT III
### (Waste of Corporate Assets)

112.    Plaintiff incorporates by reference and realleges each and every allegation set forth above as if fully set forth herein.

113.    The Individual Defendants knowingly, intentionally, recklessly or negligently breached their fiduciary duties and, thereby, caused the Company to waste its assets, expend millions of dollars of corporate funds, and impair its reputation and credibility for no legitimate business purpose, as a result of which Corcept has been and continues to be substantially damaged.

114.    The Individual Defendants have bestowed upon themselves grossly excessive compensation that has no reasonable or legitimate basis, especially due to their woeful leadership, control and supervision over the Company, management, policies, practices, controls and financial affairs which has caused substantial damage to the Company and its shareholders.

## COUNT IV
### (Contribution and Indemnification)

115.     Plaintiff incorporates by reference and realleges each and every allegation set forth above as if fully set forth herein.

116.     As alleged herein, the Individual Defendants, acting as officers and/or directors of Corcept and, therefore, as its agents, breached their fiduciary, common law and civil law duties to Corcept and its shareholders.  Additionally, Corcept is alleged to be liable to private persons, entities, and/or classes by virtue of the same facts or circumstances as are alleged herein to give rise to the Individual Defendants' liability to Corcept.

117.     Corcept's alleged liability on account of the wrongful acts and practices, as well as related misconduct described above arises, in whole or in part, from the knowing, reckless, disloyal, and/or bad faith acts or omissions of the Individual Defendants.

118.     Corcept has suffered significant and substantial injury as a direct result of the Individual Defendants' knowing, intentional, or reckless breaches of their fiduciary, common law and civil law duties as alleged herein.  Plaintiff, on behalf of the Company, seeks relief from the Individual Defendants on the theory of contribution and indemnity to the extent that Corcept is found liable for the Defendants' violations of their fiduciary duties.

## COUNT V
### (For Aiding and Abetting)

119.     Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

120.     Each of the Defendants (other than nominal defendant Corcept) has acted and is acting with knowledge of or with reckless, or grossly negligent, disregard to the fact that the Defendants are in breach of their fiduciary duties to Corcept, and have participated in such breaches of fiduciary duties.

121.    In committing the wrongful acts alleged herein, each of the Defendants have pursued, or joined in the pursuit of, a common course of conduct.  They have acted in concert with and conspired with one another in furtherance of their common plan or design.  In addition to pursuing the wrongful conduct that gives rise to their primary liability, the Defendants also aided and abetted, and/or assisted, each other in breaching their respective duties.

122.    The Defendants collectively and individually initiated a course of conduct that was designed to and did partially conceal and condone that Corcept was in violation of its obligation to implement internal corporate governance and controls, including decision making and compensation, to ensure fair and impartial decisions were made.

123.    The purpose and effect of the Defendants' conspiracy, common enterprise, and/or common course of conduct was, among other things, to disguise the Defendants' violations of law, including breaches of fiduciary duty.

124.    Because the actions described herein occurred under the Board's supervision and authority, each of the Defendants played a direct, necessary, and substantial part in the conspiracy, common enterprise, and/or common course of conduct complained of herein.

125.    Each of the Defendants aided and abetted and rendered substantial assistance in the wrongs complained of herein.  In taking such actions to substantially assist the commission of the wrongdoing complained of herein, the Defendants acted with knowledge of the primary wrongdoing, substantially assisted the accomplishment of that wrongdoing, and were aware of their overall contributions to and furtherance of the wrongdoing.

## COUNT VI
## (For Gross Mismanagement)

126.    Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

127.    The Individual Defendants had a duty to Corcept and its shareholders to prudently supervise, manage and control the operations, business and internal controls of Corcept.

128.    The Individual Defendants, by their actions and by engaging in the wrongdoing described herein, abandoned and abdicated their responsibilities and duties with regard to prudently managing the business of Corcept in a manner consistent with the duties imposed upon them by law.  By committing the misconduct alleged herein, the Individual Defendants breached their duties of good faith, due care, loyalty, diligence and candor in the management and administration of Corcept's affairs and in the use and preservation of Corcept's assets.

129.    During the course of the discharge of their duties, the Individual Defendants  knew or disregarded the unreasonable risks and losses associated with their misconduct, yet they caused Corcept to engage in the scheme complained of herein which had an unreasonable risk of damage to Corcept, thus breaching their duties to the Company.  As a result, the Individual Defendants grossly mismanaged Corcept.

130.    Plaintiff has no adequate remedy at law.

**WHEREFORE**, Plaintiff prays for judgment as follows:

A.    Declaring that the Plaintiff may maintain this action on behalf of Corcept and that Plaintiff is an adequate representative;

B.    Declaring that the Individual Defendants have breached their fiduciary, common law and civil law duties and participated and/or aided and abetted the breach of their fiduciary duties as alleged herein;

C.    Declaring that the Defendants have aided and abetted each other in their breaches of fiduciary duty;

D.    Directing Defendants, jointly and severally, to account for all losses and/or damages sustained by Corcept by reason of the acts and omissions complained of herein;

E.      Requiring the Individual Defendants to remit to Corcept all of their salaries and other compensation received for the periods when they breached their duties;

F.      Requiring Defendants to remit to Corcept all of their salaries and other compensation received for the periods when they breached their duties;

G.      Ordering equitable and/or injunctive relief as permitted by law, equity, and statutory provisions sued hereunder;

H.      Awarding pre-judgment and post-judgment interest as allowed by law;

I.      Awarding Plaintiff's attorneys' fees, expert fees, consultant fees, and other costs and expenses; and

J.      Granting such other and further relief as this Court may deem just and proper.

**JURY TRIAL DEMAND**

Plaintiff hereby demands a trial by jury.

DATED:  December 19, 2019

                                        **COOCH AND TAYLOR P.A.**

                                        */s/ Blake A. Bennett*
                                        Blake A. Bennett
                                        1007 N. Orange St., Suite 1120
                                        Wilmington, Delaware 19801
                                        Telephone: (302) 984-3800
                                        Facsimile:  (302) 984-3939
                                        Email: bbennett@coochtaylor.com

**OF COUNSEL**                          *Attorney for Plaintiff*

**WEISSLAW LLP**

Mark D. Smilow
1500 Broadway, Suite 1601
New York, NY  10036
Telephone:  (212) 682-3025
Facsimile:  (212) 682-3010
msmilow@weisslawllp.com

*Attorneys for Plaintiff*